## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**RONNY DEE TODD and LISA TODD,**

        Plaintiffs,

    vs.                             **No. 2:12-CV-00114-MCA-GBW**

**RWI ACQUISITION LLC and RWI CONSTRUCTION, INC.,**

        Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on the *Motion and Memorandum in Support of Temporary Restraining Order and Preliminary Injunction* [Doc. 19] filed by Defendant/Counter Plaintiff RWI Acquisition LLC and RWI Construction, Inc. (hereinafter collectively referred to as "RWI"), *Plaintiff's Motion to Strike Evidence Filed in Support of Defendant's Motion for Temporary Restraining Order and Preliminary Injunction* [Doc. 38], and *RWI's Motion and Memorandum in Support of Motion to Strike* [Doc. 41]. The Court held an evidentiary hearing on May 1, 2012 and May 2, 2012. Having considered the submissions, the relevant case law, and otherwise being fully advised in the premises, the Court denies the parties' motions.

RWI's *Motion and Memorandum in Support of Temporary Restraining Order and Preliminary Injunction* is based on: (1) Plaintiffs/Counter Defendants Ronny Dee Todd's and Lisa Todd's (hereinafter collectively referred to as "the Todds") alleged breach of the "Noncompetition, Nonsolicitation and Nondisparagment" Clauses (hereinafter referred to

as the "non-compete clauses") in their Employment Agreements; and (2) tortious

interference with contractual relationships.  At the evidentiary hearing, the Court found

that the Todds' Employment Agreements had expired on March 30, 2010 and that the

non-compete clauses had expired two years later, on March 30, 2012.  RWI

acknowledged that the Employment Agreements and the non-compete clauses had

expired and that there was no automatic renewal provision, but argued that these

contractual terms nonetheless were renewed for a one-year term by virtue of the Todds'

continued employment after March 30, 2010.  The Court rejected this argument on the

basis of Gonzales v. United Southwest National Bank of Santa Fe, 602 P.2d 619 (N.M.

1979), in which the New Mexico Supreme Court held in a similar context that:

> The argument assumes the existence of a provision for automatic renewal.
> Nowhere in the contract is there such a provision. . . . Where a written
> contract is for a period of more than one year, a renewal contract for a like
> period is not enforceable without a writing.  See 2 A. Corbin, Contracts §
> 504 (1950).  The contract at issue called for a three-year period of
> performance, bringing it within the purview of the Statute of Frauds.
> Westerman v. City of Carlsbad, 55 N.M. 550, 237 P.2d 356 (1951).  An
> expired contract within the statute cannot be revived and extended by parol
> agreement.  Adams v. Thompson, 87 N.M. 113, 529 P.2d 1234 (Ct. App.
> 1974), Cert. denied, 87 N.M. 111, 529 P.2d 1232 (1974), nor can a contract
> in writing be modified or varied by a subsequent oral agreement, Gee v.
> Nieberg, 501 S.W.2d 542 (Mo. App. 1973).  Accordingly, we hold that part
> or continued performance by the parties in this case did not take the
> contract out of the application of the Statute of Frauds.

Gonzales, 602 P.2d at 621.  Because the Todds' Employment Agreements called for a

three-year period of performance and did not include a provision for automatic renewal,

this Court concluded that, under Gonzales, any renewal of the Employment Agreements

2

would be unenforceable under the Statute of Frauds.  Accordingly, the evidentiary

hearing was limited to the narrow issue of whether RWI was entitled to injunctive relief

based on the Todds' alleged tortious interference with RWI's contractual relationships.

In this regard, the Court makes the following findings of fact and conclusions of law

based upon the evidence presented at the hearing.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

1.      RWI Construction, Inc., is in the business of providing above ground oil field

        construction services, such as ASME Code welding and "roustabout" services to

        oil and natural gas companies in the Hobbs, New Mexico area. [Doc. 19-1 at 1-2]

2.      To provide "roustabout" services, RWI organizes teams known as "gangs," which

        are comprised of two to four employees who travel to well sites for individual oil

        and natural gas companies, such as Conoco Phillips Company and Chesapeake

        Energy Company. [Doc. 19-1 at 2; Exhibits C and D]

3.      On March 30, 2007 RWI purchased RWI Construction, Inc. from the Todds for

        $22,000,000. [Doc. 19-3 at 2]

4.      Both the Todds and RWI are equally knowledgeable and business savvy.

5.      As part of the sale of the company, RWI and the Todds executed "Employment

        Agreements," in which Ronny Dee Todd and Lisa Todd agreed to serve as the

        President and Controller of RWI, respectively, for a three-year employment

        period.  [Docs. 19-4 and 19-5]

6.      The three-year employment period ended on March 30, 2010.

7.     The Employment Agreements included non-compete clauses,[1] which prohibited

_____

[1]The non-compete clauses provide as follows:

(a)     <u>Noncompetition</u>.        The Employee agrees that during the period commencing on the Closing Date until two years following the Expiration Date (the "<u>Restricted Period</u>"), the Employee will not, within or with respect to the geographical area of New Mexico, Texas and any other geographical area that the Company or any of its Subsidiaries operates or could reasonably be anticipated to operate during the Restricted Period (the "<u>Restricted Area</u>"), directly or indirectly own, operate, lease, manage, control, participate in, consult, advise, permit the Employee's name to be used by, provide services for, or in any manner engage in (x) any business (including by the Employee or in association with any Person) that creates, designs, sources, markets, manufactures, distributes or sells any product or provides any service in or into the Restricted Area that may be used as a substitute or otherwise compete with any product or service of the Company or any of its Subsidiaries or predecessors, carried out during the period commencing two years prior to the Closing Date and ending on the date of termination of the Restricted Period or contemplated during such period to be carried out by the Company or any of its Subsidiaries or predecessors or (y) any activity that is in competition with, or potential competition with, the Business or any other business of the Company or any of its Subsidiaries.  Nothing in this <u>Section 5</u> shall prohibit the Employee from being a passive owner of less than 1% of the outstanding capital stock of a corporation of any class which is publicly traded, so long as the Employee has no direct or indirect participation in the business of such corporation.

(b)     <u>Nonsolicitation</u>.        The Employee agrees that during the Restricted Period, the Employee will not, without written consent of the Company, directly or indirectly, including causing, encouraging, directing or soliciting any other Person to, contact, approach or solicit (other than, so long as the Employee continues to be employed by the Company and makes such contact, approach or solicitation made on behalf of the Company) who is or has been employed or retained in the operation of the Business during the period commencing two years prior to the Closing Date and ending on the date of the termination of the Restricted Period, or induce, interfere with or solicit, or attempt to induce, interfere with or solicit, any Person that is a current or former customer, supplier or other business relation of the Company or any of its Subsidiaries or predecessors into any business relationship that might harm the Business, or in any manner engage in or own, directly or indirectly, any interest in any business that provides services or products to any current or former customer of the Company or any of its Subsidiaries or predecessors that are similar to or competitive with the services or products provided by the Company or any of its Subsidiaries or predecessors to such current or former customers.

(c)     Nondisparagement.    The Employee agrees not to disparage the Company, its Subsidiaries or predecessors, or their past and present investors,

the Todds from competing with RWI or soliciting the employees of RWI "during the period commencing on the Closing Date until two years following the Expiration Date (the 'Restricted Period')." [Docs. 19-4 at 7 and 19-5 at 7]

8.  The "Closing Date" was March 30, 2007, the date on which the purchase of RWI Construction, Inc. was consummated.  [Docs. 19-4 at 2 and 19-5 at 2]

9.  The "Expiration Date" was March 30, 2010, the date on which the Todds' three-year employment period expired. [See Doc. 19-4 at 5 and 19-5 at 4].

10. The "Restricted Period" ended on March 30, 2012 and the non-compete clauses are no longer enforceable.

11. The Todds worked at RWI through the three-year employment period until January of 2011, when RWI terminated their employment. [Doc. 19-3]

12. Following their termination, the Todds began working at Tex-Mex Rentals, LLC, which provides frac tank services[2] in the Hobbs area.

13. RWI does not provide frac tank services.

14. Although Tex-Mex Rentals, LLC and/or its affiliate company Tex-Mex Services (hereinafter collectively referred to as "Tex-Mex") advertises that it has an

---

officers, directors or employees or any of their Affiliates.  The Company agrees
not to disparage Employee or the Employee's family.
[Docs. 19- 4 at 7-8 and 19-5 at 7-8]

[2]According to Mr. Todd's testimony frac tanks are "tanks that we've accumulated and we built and we put them out on these frac jobs.  What they do is they explore down hole and they use these tanks to put fresh water in and they use high pressure sand and water to frac cavities to bring in the oil and gas into the well."

"ASME Code Stamp," Tex-Mex is not certified in ASME code welding and does not offer any ASME code welding services.

15. On April 2, 2012, three days after the non-compete clauses expired, Tex-Mex began providing roustabout services in the Hobbs area in direct competition with RWI.

16. Mr. Todd informed various individuals, including Earl Lee Rowe, II, Vice President of Sorenson Capital Group and Thelma Rangel, a Sani-Tech at RWI, that he intended to put RWI out of business.

17. These statements were made in the heat of competition following the Todds' contentious termination from their employment at RWI.

18. Although putting RWI out of business might have been part of the Todds' motive in forming a competing business, the Court finds that the Todds invested $ 4.5 million of their own money in Tex-Mex with the primary motive of creating a productive and profitable business enterprise.

19. On April 2, 2012, approximately thirty-four of RWI's roustabout employees quit without notice and immediately began working for Tex-Mex.

20. Nine of these employees had provided roustabout services to RWI's customer, Chesapeake Energy Company, and twenty-five of these employees had provided roustabout services to RWI's customer, Conoco Phillips Company.

21. As a result of these employees' departure, RWI was no longer able to provide roustabout services to these customers.

6

22.   Instead, Tex-Mex now provides roustabout services to Chesapeake Energy

Company and Conoco Phillips Company via RWI's former employees.

23.   Similarly, one of RWI's competitors, Tech Star, "hire[d] away" five of RWI's

roustabout gangs that had provided services to RWI's customer, Texas Lands Oil

Company.  Mr. Rowe testified that such conduct is "not wrongful" in the oil and

natural gas industry, even if Tech Star had hired away RWI's employees "with the

specific knowledge they were going to get those same crews to work for Texas

Lands and Oil Company on work that RWI was doing."

24.   In mid-April of 2012, four of RWI's dirt workers[3] who had provided services to

Conoco Phillips Company quit their employment with RWI and immediately

began working for Tex-Mex.

25.   The mass departure of RWI's employees has imposed a financial burden on RWI

and has had an adverse impact on employee morale and customer confidence.

26.   If RWI continues to lose its employees and customers at this rate, then the

company will go under.

27.   All of the RWI employees who went to work for Tex-Mex were at-will employees.

28.   Prior to their departure, many of these employees were unhappy at RWI due to

inaccuracies in their paychecks, a perceived failure to award accurate and timely

---

[3]According to the testimony of David Frederick, District Manager at RWI, a dirt worker is "actually a heavy equipment operator, or a CDL truck driver or a spotter, which spots the trucks when they come in loaded with dump trucks, loaded with material, build roads in locations and does environmental cleanup."

pay raises, RWI's implementation of a new payroll practice, and the termination of certain employee benefits.

29.    RWI has contractual agreements with Chesapeake Energy Company and Conoco Phillips Company, but these contractual agreements do not require Chesapeake Energy Company or Conoco Phillips Company to use RWI's roustabout gangs for any specific project.

30.    Thus, at most, RWI had a future economic expectancy with respect to the continued provision of roustabout services to Chesapeake Energy Company and Conoco Phillips Company.

31.    On February 23, 2012, the Todds filed *Plaintiffs' Original Complaint*, which alleges that:  (1) RWI breached the implied covenant of good faith and fair dealing; (2) RWI breached Ronny Dee Todd's Restricted Equity Award Agreement and Employment Agreement; (3) RWI breached Lisa Todd's Restricted Equity Award Agreement and Employment Agreement; (4) RWI breached the Todds' Subscription and Members Agreement; (5) RWI breached the Todds' Stock Purchase Agreement; (6) the Todds are entitled to a declaratory judgment; (7) RWI defamed the Todds; (9) RWI violated § 10(b) of the Securities Exchange Act and Rule 10b-5; and (10) RWI violated the New Mexico Securities Act of 1968. [Doc. 1 at 19-30]

32.    On April 11, 2012, RWI filed its *First Amended Counterclaim*, which alleges that: (1) the Todds breached their fiduciary duty; (2) the Todds are liable for

8

conversion; (3) the Todds breached their contract, (4) the Todds breached the implied covenant of good faith and fair dealing; (5) the Todds are liable for interference with existing and prospective contractual relations; (6) the Todds are liable for conspiracy to violate the duty of loyalty; (7) the Todds are liable for unjust enrichment; (8) RWI is entitled to an accounting; (9) certain proceeds should be placed in a constructive trust; and (10) RWI is entitled to a temporary restraining order, preliminary injunction and permanent injunction. [Doc. 18 at 25-35]

33.     On April 11, 2012, RWI also filed the present *Motion and Memorandum in Support of Temporary Restraining Order and Preliminary Injunction*, which seeks in relevant part a temporary restraining order and preliminary injunction prohibiting the Todds from soliciting RWI's current customers and from soliciting or hiring RWI's current employees.  [Doc. 19; and as clarified at hearng]

## II.     DISCUSSION

### A.     *Motions to Strike*

As a threshold matter, the Court must determine what evidence is properly before the Court with respect to RWI's motion for a temporary restraining order and preliminary injunction.  Both parties have filed motions to strike, challenging the admissibility of certain exhibits under the Federal Rules of Evidence. [See Docs. 38 and 41]  In Heideman v. South Salt Lake City, 348 F.3d 1182 (10th Cir.2003), the Tenth Circuit Court of Appeals observed that:

9

"a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules. The Federal Rules of Evidence do not apply to preliminary injunction hearings. See, e.g., SEC v. Cherif, 933 F.2d 403, 412 n. 8 (7th Cir.1991); Asseo v. Pan Am. Grain Co., 805 F.2d 23, 25–26 (1st Cir.1986); United States v. O'Brien, 836 F.Supp. 438, 441 (S.D.Ohio 1993). Thus, as a prudential matter, it bears remembering the obvious: that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits.

348 F.3d at 1188.  Accordingly, "[a]ffidavits based on belief or hearsay statements may be considered by the trial court in evaluating a request for preliminary injunctive relief. Not surprisingly, however, affidavits based on personal knowledge will be more persuasive than affidavits based on belief or hearsay."  13 James Wm. Moore, Moore's Federal Practice §65.23 (3d ed. 2012).

Because the Federal Rules of Evidence do not apply to hearings on preliminary injunctions, the Court denies *Plaintiffs' Motion to Strike Evidence Filed in Support of Defendants' Motion for Temporary Restraining Order and Preliminary Injunction* [Doc. 38] and *RWI's Motion and Memorandum in Support of Motion to Strike* [Doc. 41].  The parties' arguments pertain to the weight of the evidence, but not its admissibility.

B.    *Motion and Memorandum in Support of Temporary Restraining Order and Preliminary Injunction*

1.    *Applicable Standard*

The decision to grant a temporary restraining order or a preliminary injunction is

10

within the Court's discretion.  See Winnebago Tribe of Nebraska v. Stovall, 341 F.3d

1202, 1205 (10th Cir. 2003).  "Because a preliminary injunction is an extraordinary

remedy, the right to relief must be clear and unequivocal." Greater Yellowstone Coal. v.

Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003).  "To obtain a preliminary injunction, the

moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood

that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that

the balance of equities tips in the movant's favor; and (4) that the injunction is in the

public interest." Attorney Gen. of Oklahoma v. Tyson Foods, Inc., 565 F.3d 769, 776

(10th Cir. 2009) (internal quotation marks and citation omitted). "Generally, where the

moving party has established that the [latter] three harm factors tip decidedly in its favor,

the probability of success requirement is somewhat relaxed and the movant need only

show questions going to the merits so serious, substantial, difficult and doubtful, as to

make them a fair ground for litigation." Nova Health Sys. v. Edmondson, 460 F.3d 1295,

1298 n.6 (10th Cir. 2006) (internal quotation marks and citations omitted).  However, this

relaxed standard does not apply to the "three types of disfavored injunctions," which are:

> (1) preliminary injunctions that alter the status quo; (2) mandatory
> preliminary injunctions; and (3) preliminary injunctions that afford the
> movant all the relief that it could recover at the conclusion of a full trial on
> the merits. When a preliminary injunction falls into one of these categories,
> it must be more closely scrutinized to assure that the exigencies of the case
> support the granting of a remedy that is extraordinary even in the normal
> course. A district court may not grant a preliminary injunction unless the
> moving party makes a strong showing both with regard to the likelihood of
> success on the merits and with regard to the balance of harms.

Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012) (internal quotation marks and

citation omitted).

The status quo "is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.  In determining the status quo for preliminary injunctions, [the Tenth Circuit] looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."  Schrier v. Univ. Of Colorado, 427 F.3d 1253, 1260 (10th Cir. 2005).  In this case, the last uncontested status between the parties was prior to the Todds' alleged solicitation of RWI's employees and customers.  Accordingly, the Court concludes that the requested injunctive relief seeks to preserve, rather than alter, the status quo.  See id. (holding that the plaintiff's request for reinstatement as Chair of the Department of Medicine "seeks to preserve rather than disturb the status quo, regardless of whether or not [the plaintiff] is legally entitled to such reinstatement").

"There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing."  Id. (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 1006 (10th Cir. 2004)).  "The distinction between mandatory and prohibitory injunctions . . . cannot be drawn simply by reference to whether or not the status quo is to be maintained or upset."  Schrier, 427 F.3d at 1260 (internal quotation marks and citation omitted).  Nor can the distinction be drawn based on "whether the non-moving party is being ordered to perform an act, or refrain from performing" an act because "[i]n many instances, this distinction is more semantical than substantive."  Id.  (internal quotation marks and citation omitted).  Instead, the Tenth

12

Circuit "characterizes an injunction as mandatory if the requested relief affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction."  Id. at 1261 (internal quotation marks and citation omitted).

In this case, as clarified at the hearing by RWI, RWI seeks a temporary restraining order and preliminary injunction prohibiting the Todds from soliciting RWI's current customers and from soliciting or hiring RWI's current employees.  The Court concludes that the relief requested does not require the Todds to act in a particular way that may require ongoing Court supervision.  See CRST Van Expedited, Inc. v. J.B. Hunt Transp., Inc., No. CIV-04-651-F, 2006 WL 335765, at *13 (W.D.Okla. Feb. 14, 2006) (concluding that a preliminary injunction preventing the defendant from hiring the plaintiff's employees was a prohibitory injunction that did not require ongoing court supervision). Accordingly, the injunctive relief requested is prohibitory, rather than mandatory.

Finally, the injunctive relief requested does not afford RWI all of the relief that it could recover at the conclusion of a full trial on the merits on its counterclaims for breach of fiduciary duty, conversion, breach of contract, breach of the implied covenant of good faith and fair dealing, interference with existing and prospective contractual relations, conspiracy to violate the duty of loyalty, unjust enrichment, accounting, constructive trust, and a temporary restraining order, preliminary injunction and permanent injunction. The Court therefore concludes that the relaxed standard of review is applicable to this

13

case.

<u>2.</u>      *Tortious Interference With Contractual Relationships*

New Mexico recognizes two different types of tortious interference with contractual relationships: tortious interference with *existing* contractual relationships and tortious interference with *prospective* contractual relationships.  To prove an intentional interference with an *existing* contractual relationship, RWI must establish the following: (1) the Todds had knowledge of an existing contract; (2) performance of the contract was refused, (3) the Todds played an active and substantial part in causing RWI to lose the benefits of the contract, (4) damages flowed from the breached contract, and (5) the Todds induced the breach without justification or privilege.  See Guest v. Berardinelli, 195 P.3d 353, 363 (N.M.App. 2008); Ettenson v. Burke, 17 P.3d 440, 446 (N.M. App. 2001).  To establish a lack of justification or privilege, there must be evidence that the Todds acted with either an improper motive or by improper means.  See Guest, 195 P.3d at 363; see also M & M Rental Tools Inc. v. Milchem Inc., 612 P.2d 241, 244 (N.M. App. 1980) (holding that the movant "has the burden of proving the interference was improper").  The improper motive need not be the Todds' sole motive, but it must be the primary motive.  See Fikes v. Furst, 81 P.3d 545, 552-53 (N.M. 2003) ("The inquiry, in the end, should be to determine the party's primary motivation for the interference. If it was primarily improper, then the person has no privilege. If it was primarily proper, then liability should not attach.).  "What may qualify as 'improper means' depends to some degree on context and can include, but is not limited to predatory behavior, violence,

threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs." Zarr v. Washington Tru Solutions, L.L.C., 208 P.3d 919, 922 (N.M. App. 2009).

To establish an intentional interference with a *prospective* contractual relationship, RWI must prove the elements enumerated above and, if relying upon the improper-motive ground for the tort, must prove that the improper motive was the Todds' *sole* motive. See Fikes, 81 P.3d at 552; see also Zarr, 208 P.3d at 921-23 (clarifying that if the sole motive standard is satisfied, then there need not be any proof of improper means). This is because "New Mexico cases have consistently recognized that existing contractual relationships merit more protection than prospective contracts and that, as a result, a different analysis is appropriate for the two situations." Zarr, 208 P.3d at 922; see also Fikes, 81 P.3d at 552 ("When the interest at stake is an existing contractual relationship, a different analysis is appropriate than when the interest at stake is a prospective contractual relationship.").

The contractual relationships at issue in this case are prospective only. First, with respect to RWI's employees, the New Mexico Court of Appeals has held that an interference with a contract terminable at-will is an interference with a prospective employment relationship. Zarr, 208 P.3d at 923; Kelly v. St. Vincent Hosp., 692 P.2d 1350, 1356 (N.M. App. 1984). Second, with respect to RWI's customers, RWI had no legal assurance of the continued provision of roustabout services to Chesapeake Energy

Company and Conoco Phillips Company and, therefore, at most, RWI had an economic

expectancy of a prospective contractual relationship.  See M & M Rental Tools Inc., 612

P.2d at 244 (holding that "economic expectancies" are protected by the tort of intentional

interference with prospective contractual relationships).  To be entitled to the injunctive

relief that it seeks, RWI must establish a fair ground for litigation of its tortious

interference with prospective contractual relationships claim by adducing evidence that

the Todds' sole motive for interference was improper or that the Todds used improper

means.

        At this juncture, the Court wishes to emphasize that in light of its previous ruling

regarding the expiration of the non-compete clauses on March 30, 2012, there is nothing

to prevent the Todds from providing roustabout services in direct competition with RWI.

Indeed, the Todds are free to compete with RWI to attract the most skilled roustabout

employees in the Hobbs area and the most lucrative oil and natural gas customers.  "[I]t is

no tort to beat a business rival to prospective customers.  Thus, in the absence of a

prohibition by statute, illegitimate means, or some other unlawful element, a defendant

may seek to increase his business without incurring liability."  M & M Rental Tools, 612

P.2d at 246 (internal quotation marks and citation omitted); see also Restatement

(Second) of Torts, § 768 (2011) ("One who intentionally causes a third person not to enter

into a prospective contractual relation with another who is his competitor or not to

continue an existing contract terminable at will does not interfere improperly with the

other's relation if (a) the relation concerns a matter involved in the competition between

16

the actor and the other and (b) the actor does not employ wrongful means and (c) his

action does not create or continue an unlawful restraint of trade and (d) his purpose is at

least in part to advance his interest in competing with the other.").  As Judge Learned

Hand observed in the seminal case of <u>Triangle Film Corp. v. Artcraft Pictures Corp.</u>, 250

F. 981, 982 (2d Cir. 1918):

> Nobody has ever thought, so far as we can find, that in the absence of some
> monopolistic purpose every one has not the right to offer better terms to
> another's employee, so long as the latter is free to leave. The result of the
> contrary would be intolerable, both to such employers as could use the
> employee more effectively and to such employees as might receive added
> pay. It would put an end to any kind of competition.

<u>Id.</u>  "[C]ompetition is a necessary or desirable incident of free enterprise.  Superiority of

power in the matters relating to competition is believed to flow from superiority in

efficiency and service.  If the actor succeeds in diverting business from his competitor by

virtue of superiority in matters relating to their competition, he serves the purposes for

which competition is encouraged."  Restatement (Second) of Torts, <u>supra</u>, cmt. (b).

Although the Todds are free to compete in the marketplace for RWI's existing customers

and at-will employees, New Mexico law precludes any tortious interference with these

prospective contractual relationships by improper means or with a sole improper motive.

RWI first argues that the Todds' means of interference was improper because the

Todds violated the non-compete clauses in their Employment Agreements before those

clauses expired on March 30, 2012.  Assuming, without deciding, that the Todds

breached the non-compete clauses, the Court nonetheless holds that the Todds'

competition with RWI is no longer improper in light of the Court's prior ruling regarding the expiration of these clauses.  To be entitled to prospective injunctive relief, a party must demonstrate a "continuing injury or be under a real and immediate threat of being injured in the future."  Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004). The Todds' alleged violation of the non-compete clauses is a past injury redressable at law, rather than a continuing injury necessitating the extraordinary remedy of injunctive relief.  See City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a likelihood of substantial and immediate irreparable injury.") (internal quotation marks and citation omitted).  Accordingly, the Court will consider this evidence only insofar as it demonstrates an alleged pattern or practice of predatory behavior.

RWI argues that the Todds are engaging in predatory behavior by specifically targeting and soliciting RWI's existing employees and customers.  The evidence before the Court established that many of RWI's employees were unhappy at the company due to inaccuracies in their paychecks, a perceived failure to award accurate and timely pay raises, RWI's implementation of a new payroll practice, and the termination of certain employee benefits.  At the hearing, there was no direct evidence presented that the Todds specifically solicited or targeted any of RWI's existing employees or customers.[4]  Rather,

---

[4]Thelma Rangel, a Sani-Tech for RWI, testified that her sister went to Tex-Mex's offices to apply for a job prior to March 30, 2012 and that Mr. Todd told her sister "to let [her] know that he wanted to talk to [Ms. Rangel]" about employment at Tex-Mex.  The Court finds this

RWI asks the Court to infer predatory behavior based on the Todds' enmity toward RWI and the mass departure of RWI's employees, and with them RWI's customers Chesapeake Energy Company and Conoco Philips Company.

Predatory behavior is defined as behavior that is "'wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.'" <u>Diversey Corp. v. Chem-Source Corp.</u>, 965 P.2d 332, 339 (N.M. App. 1998) (quoting <u>M & M Rental Tools</u>, 612 P.2d at 246). "Thus, predatory behavior includes behavior that is not otherwise tortious, but which becomes tortious when it results in a wrongful interference with another's contractual relations." <u>Id.</u>

In this case, there is no evidence indicating that the Todds engaged in any behavior that was wrongful by reason of a statute, regulation, or recognized rule of common law. Additionally, the Court cannot find that the Todds' behavior violated established business standards because there is no evidence in the record regarding the existence, or non-existence, of an established business standard for the recruitment of employees and customers in the above ground oil field construction services industry. The sole evidence of an applicable business standard came from the testimony of Mr. Rowe, who testified that five of RWI's roustabout gangs who provided services to RWI's customer Texas

_____

evidence of solicitation to be of little persuasive value, given that it is based on the hearsay statement of Ms. Rangel's sister, who was not present in court to testify. <u>See Heideman</u>, 348 F.3d at 1188 ("The Federal Rules of Evidence do not apply to preliminary injunction hearings"); 13 James Wm. Moore, <u>Moore's Federal Practice</u> §65.23 (3d ed. 2012) (noting that, although the Federal Rules of Evidence do not apply to preliminary injunction hearings, evidence based on personal knowledge is more persuasive than evidence based on belief or hearsay).

Lands Oil Company left to work for a rival oil and natural gas services company, Tech Star. Although the employees' departure "took business away from RWI," Mr. Rowe testified that Tech Star is allowed to compete with RWI and is allowed to "hire away" RWI's employees. When asked whether Tech Star's conduct would be wrongful "if [it] hired [RWI's employees] with the specific knowledge they were going to get those same crews to work for Texas Lands and Oil Company on work that RWI was doing," Mr. Rowe responded "no." On the basis of the record before it, the Court is compelled to conclude that RWI is unlikely to prevail on its tortious interference with prospective contractual relationships claim insofar as it is based on the Todds' alleged predatory behavior.

RWI further contends that the Todds used improper means to attract RWI's employees and customers by making certain misrepresentations of fact. First, RWI points out that Tex-Mex erected a sign advertising that it has an "ASME Code Stamp," even though the undisputed testimony at the hearing demonstrated that Tex-Mex is not certified in ASME code welding and does not offer any ASME code welding services. The Court rejects this argument, because there is no evidence to suggest that the Todds' misrepresentation regarding an ASME code stamp induced any employees or customers to leave RWI in favor of Tex-Mex. Second, RWI points to Mr. Todds' statements regarding "putting RWI out of business" and contends that these statements have had a chilling effect on RWI's ability to attract employees and customers. The Court finds that these statements, which were made in the heat of competition following the Todds'

contentious termination from their employment at RWI and which did not induce any employees or customers to leave RWI, are insufficient to support a claim of tortious interference with RWI's prospective contractual relationships.  See The Finish Line v. Foot Locker, Inc., No. 1:04CV877RLYWTL, 2006 WL 146633, at *9 (S.D. Ind. January 18, 2006) (holding that the defendants "offhand statements" that its recruit plan would "hit the competition where it hurts" or "destroy" the plaintiffs' business were made in the "heat of competition" and "are insufficient to support a prima facie case").

Alternatively, RWI contends that the Todds' motive is improper in light of Mr. Todd's statements that he "intended to put RWI out of business."  The Court finds that putting RWI out of business was not the Todds' sole, or even primary, motive in forming a competing company.  Rather, the Court finds that the Todds invested $ 4.5 million of their own money in Tex-Mex because they believed that it would be a productive and profitable business enterprise.  "The desire to earn a profit is not an improper motive." Martin v. Franklin Capital Corp., 195 P.3d 24, 29 (N.M. App.2008).  The fact that Tex-Mex's success would achieve the Todds' ancillary objective of hurting RWI's business is insufficient to establish a likelihood of prevailing on the tort of tortious interference with prospective contractual relationships.  See Zarr, 208 P.3d at 924-25 ("New Mexico courts have adopted a view that where a defendant is accused of interfering with a plaintiff's opportunity to enter into prospective contracts, a strong showing must be made that the defendant acted not for legitimate business reasons but from some motive such as personal vengeance or spite. If the accused can show a legitimate business reason for the

action, even if there also may have been a motive to harm the plaintiff, no material issue of fact exists.") (citation omitted).

For the reasons discussed above, with respect to the pending motion for temporary restraining order and preliminary injunction, the Court concludes that RWI has failed to meet its burden of proof on the merits of its tortious interference with prospective contractual relationships claim.  On the factual record before it, the Court cannot find that there are issues "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation."  <u>Nova Health Sys.</u>, 460 F.3d at 1298 n.6 (internal quotation marks and citations omitted).  Accordingly, RWI's *Motion and Memorandum in Support of Temporary Restraining Order and Preliminary Injunction* [Doc. 19] is hereby denied.

## III.    CONCLUSION

For the foregoing reasons, *Plaintiff's Motion to Strike Evidence Filed in Support of Defendant's Motion for Temporary Restraining Order and Preliminary Injunction* [Doc. 38] is **DENIED**, *RWI's Motion and Memorandum in Support of Motion to Strike* [Doc. 41] is **DENIED**, and RWI's *Motion and Memorandum in Support of Temporary Restraining Order and Preliminary Injunction* [Doc. 19] is **DENIED**.

**SO ORDERED** this 1st day of June, 2012, in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
United States District Judge